In re Kenneth A. PELS, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals.

No. 93–BG–1395.

District of Columbia Court of Appeals.

Argued Dec. 7, 1994.
Decided Jan. 30, 1995.

---

Ross T. Dicker, Asst. Bar Counsel, with whom Leonard H. Becker, Bar Counsel, and Wallace E. Shipp, Jr., Deputy Bar Counsel, were on the brief, for Bar Counsel.

Randall C. Smith for respondent.

Before FARRELL and KING, Associate Judges, and GALLAGHER, Senior Judge.

FARRELL, Associate Judge:

This disciplinary matter, as various members of the Board on Professional Responsibility recognized, tests the resolve of this court in enforcing the rule reaffirmed in *In re Addams,* 579 A.2d 190 (D.C.1990) (en banc), "that in virtually all cases of misappropriation, disbarment will be the only appro-

trial court had already imposed less severe sanctions without success. That is not the case here.

priate sanction unless it appears that the misconduct resulted from nothing more than simple negligence." *Id.* at 191. Majorities of the Hearing Committee (the Committee) and the Board on Professional Responsibility (the Board) concluded that respondent misappropriated client funds and did so recklessly, *i.e.*, as a result of more than simple negligence. The Committee majority recommended disbarment in light of *Addams*, as did two Board members. The other three Board majority members recommended that disbarment be stayed as to all but a three-month period of suspension, to be followed by probation subject to practice and financial monitors. The four dissenting Board members concluded that respondent's conduct involved no more than simple negligence, and recommended suspension for six months.

We agree with the majorities of the Committee and the Board that respondent misappropriated client funds, that his conduct in doing so was reckless, and that *Addams* requires his disbarment. We reject the recommendation of some Board members of a stay of disbarment, as we believe that would enervate, if not destroy, the deterrent force of the rule reaffirmed in *Addams*. And we decline to apply the mitigation rule of *In re Kersey*, 520 A.2d 321 (D.C.1987), and succeeding cases, so far applicable only to attorney misconduct caused by substance abuse or mental illness,[1] to this case of reckless misappropriation caused by neither. The sanction we impose may seem harsh as applied to an attorney not claimed to have been dishonest and who undertook here "his first representation of a plaintiff in a contingent fee personal injury matter." [2] But in *Addams* we placed upon the attorney the burden of proving "extraordinary circumstances," 579 A.2d at 191, that justify departure from the presumptive rule of disbarment for conduct such as respondent's that jeopardizes client funds held in trust and undermines public confidence in the bar. No such exceptional circumstances have been shown to us in this case.

## I.

On February 27, 1992, Bar Counsel filed a petition for discipline alleging that respondent had (1) commingled personal funds with those of a client in a non-escrow bank account; (2) misappropriated client settlement funds he was obligated to retain for payment to the client's third-party medical care providers; (3) failed to maintain records and render accounts to the client; and (4) failed to deliver promptly client funds.[3] Respondent answered by admitting that "funds held on the complainant's behalf were commingled in a non-escrow account," but otherwise denied the allegations of misconduct.

A hearing committee conducted an evidentiary hearing and made detailed written findings of fact. Thereafter, the Board majority, while recognizing its obligation "to accept the hearing committee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole," *In re Micheel*, 610 A.2d 231, 234 (D.C.1992), summarized the evidence independently with repeated citations to the record, and only then sustained "the factual findings of the Hearing Committee regarding [r]espondent's misappropriation and recklessness [as] supported by substantial evidence." We in turn set forth the facts as found by the Board (and the Committee) mindful of our obligation to accept "the findings of fact made by the Board unless they are unsupported by substantial evidence of the record...." D.C.Bar R. XI, § 9(g) (1994).

Elizabeth Langlois retained respondent in August 1986, while she was in the hospital recovering from injuries sustained in a motor vehicle accident. She signed a retainer agreement providing for respondent to rep-

---

**1.** *See, e.g., In re Temple*, 596 A.2d 585 (D.C.1991); *In re Miller*, 553 A.2d 201 (D.C.1989).

**2.** *See* Separate Opinion of Board member Donnenfeld, at 1.

**3.** Specifically, respondent was charged with violating DR 9–103(A) (commingling); DR 9–103(A) (misappropriation); DR 9–103(B)(3) & Rule

1.15(a), (b) (failure to maintain records and to render accounts to a client); and Rule 1.15(b) (failure to promptly deliver client funds). Because respondent's conduct in question took place between 1989 and 1991, the charges were brought under both the Code of Professional Responsibility and the present Rules of Professional Conduct, which became effective January 1, 1991.

resent her in a possible personal injury action arising from the accident. Respondent's fee was to be thirty-three percent of any amounts recovered. Ms. Langlois agreed "to pay, in addition to Attorney's fees, all reasonable and necessary costs as incurred in this matter"; respondent was to "pay all expenses and charges from monies received from any recovery or settlement."

In December 1988, respondent negotiated a settlement of the claim with the insurance carrier for the other driver, and on January 6, 1989, the insurance company sent him a check for $20,000, the proposed settlement amount, payable to Ms. Langlois and respondent as her attorney. Respondent wrote Ms. Langlois two letters dated January 9, 1989. One reviewed the reasons why he recommended accepting the $20,000 settlement offer. The other outlined the proposed distribution of the proceeds. It began by stating that "[w]e[4] will waive the recoverable cost incurred in this litigation and I am waiving $300 of the fee and $500 of the Administrative Cost." It then represented that, in addition to the one-third amount ($6,666.66) respondent was entitled to receive under the retainer agreement, settlement funds would be withheld for distribution to four medical providers, including $1,772 to Dr. William Launder for examination and evaluation, $345 to Neurodiagnostic Center ("Neurology" in the letter), and $185 to Greater Laurel Beltsville Hospital. From the remaining amount an additional $500 would be deducted for "Approximate Administrative and Miscellaneous Expenses," and the waived $800 in partial fees and administrative costs would be restored to the amount, leaving a balance due Ms. Langlois of $11,206.34. Ms. Langlois accepted the settlement and agreed to the proposed distribution.

Respondent obtained Ms. Langlois' endorsement on the $20,000 check and deposited it into an account at Citizens Bank of Maryland. This was not an escrow or client trust account, but rather a checking account (variously referred to in the proceedings as an operating or "flush" account) which respondent used to pay business and personal expenses. He maintained a second account in the same bank, which was a savings account in the names of himself and his wife that earned higher interest than the checking account but on which the depositor could not write checks. Respondent had relied on the advice of bank officials in maintaining this "two-tiered" or tandem account structure; he testified that his practice was to transfer funds from the latter account to the former as needed to cover obligations. He did not seek the advice of any attorneys in regard to escrow accounts, even though his firm had both an operating account and an escrow account.

On January 10, 1989, after depositing the settlement check, respondent issued a check drawn on the operating account to Ms. Langlois in the amount of $11,206.34. After this check was presented and honored, and before respondent began reimbursing the medical care providers, the balance in his operating account was $9,902.51, including $2,427 held in trust to pay Ms. Langlois' medical bills. Over the next several months, however, respondent wrote a large number of checks from the account for family and personal expenses as well as for business-related expenses.[5] The result was that, after respondent distributed two checks totalling $1,200 to Dr. Launder, his checking account balance fell below the amounts needed to pay the balance of outstanding claims of Dr. Launder, Neurodiagnostic Center, and the hospital. As the Committee found, "[t]he account

---

4. Respondent was then a principal in the law firm of Borzilleri, Baker & Pels, with offices in the District of Columbia.

5. Merely by way of example, from January 11 to January 17, 1989, in addition to client- or firm-related checks, respondent wrote checks totalling $204.60 to Giant Food; two checks totalling $297.88 on behalf of his son, Jon Pels; and two other checks to Visa and Montgomery Ward, also apparently for personal expenses. Later in January he wrote two checks totalling $1,350 to Villanova University on behalf of his son, as well as other checks for personal expenses. Checks in February included one for $1,000 to Villanova, $100 to Giant Food, and $225 to Montgomery Country Club. His numerous checks for personal matters in March included four totalling $364.19 to Giant Food; two totalling $325 to Jon Pels; and other checks to Montgomery Ward, Chrysler Credit, and Circuit City.

balance ... fluctuated, so that on some days in February and March 1989, there were more funds in the Citizen/operating account than [r]espondent was obligated by his own accounting to pay out to Ms. Langlois' medical providers[,] while on other days there were not sufficient funds to do so." By late March 1989 the checking account was overdrawn, at a time when respondent was still holding funds for payment to Ms. Langlois' medical care providers.

In April 1989, respondent opened another non-escrow checking account, this time at Riggs Bank with a deposit of $322. No evidence was elicited explaining whether this was a successor to the two Citizens Bank accounts or an additional account. In October 1989, respondent drew a check on this account for $345 payable to Neurodiagnostic Center. The check was presented twice, first in November and then in December 1989, and was dishonored both times because of insufficient funds. At the point in December 1989 when the balance in the Riggs account was in overdraft, respondent was still required to hold funds to pay Dr. Launder and the hospital. In January 1990, one year after settlement of Ms. Langlois' personal injury claim, respondent issued a new check to the Neurodiagnostic Center that was presented and honored.

In December 1990, respondent opened his first escrow account, this time at Damascus Community Bank. Meanwhile, Ms. Langlois had begun receiving bills from Dr. Launder claiming an outstanding balance due. In June 1991, after Bar Counsel notified him of the receipt of a disciplinary complaint from Ms. Langlois, respondent issued one additional check to Dr. Launder for $140. Respondent had now paid Dr. Launder by way of three checks totalling $1,340, after advising his client that he was holding back $1,772 in settlement funds to pay Dr. Launder's outstanding bill. Respondent testified that the $432 difference was attributable to an irregularity in Dr. Launder's charges which

respondent's staff had discovered. According to Ms. Langlois, however, she never received the benefit of this saving, and respondent never asked permission to use this money for any purpose other than to pay the bills listed in the distribution letter. The Committee found that respondent retained $432 from the settlement funds which were never paid out or distributed. As to the $185 owed to Greater Beltsville Community Hospital, the Committee found that respondent had produced no records documenting this payment, but that "in the absence of any evidence [adduced by Bar Counsel] to the contrary," the hospital bill had been paid.[6]

At various times between August 1986 and August 1989, respondent had advised Ms. Langlois concerning her medical discharge from the Navy, which resulted from injuries she sustained in the motor vehicle accident. When he asked her to sign a retainer for his services related to the Naval Board, however, she refused, stating that she had done most of the preparation herself. Respondent nonetheless testified that his unreimbursed expenses for these and yet other services on Ms. Langlois' behalf entitled him to the difference between the $1,772 held to pay Dr. Launder and the $1,340 paid. As the Committee found, however, respondent could produce neither a retainer agreement nor a "statement or invoice for these services[ ] or out-of-pocket disbursements incurred in connection therewith." The Board similarly found that respondent "produced no exhibits showing that the savings [7] had been properly accounted for and credited against any amounts that Ms. Langlois might owe him."

## II.

On the basis of these facts, the Committee concluded that Bar Counsel had proved the charge of misappropriation by clear and convincing evidence:

[Respondent's] Riggs account—set up after, and apparently replacing the two-tier

---

6. The Board was skeptical of this finding, noting that respondent's "proof that the payment was made 'is that [in respondent's words] we never got any dunning notices or any billings from them.' "

7. Respondent testified, and neither the Committee nor the Board disputed, that the reduced total amount paid Dr. Launder resulted from irregularities in the billing that respondent or his staff had discovered on Ms. Langlois' behalf.

structure [of linked checking and savings accounts at Citizens]—was overdrawn before the medical bills were settled. At this point, a misappropriation occurred.

The Board saw the misappropriation as having begun earlier, concluding that

when Respondent deposited Ms. Langlois' insurance funds into his [Citizens] flush account, and then proceeded to write several checks for unrelated expenditures from this "flush" account, and the funds in the account fell below what was owed the client, Respondent committed misappropriation.

Moreover, "even if [r]espondent were correct" that the two Citizens Bank accounts "must be considered together," the Board concluded that

misappropriation occurred when the bank dishonored Respondent's $345 check drawn on the Riggs account many months later. The record contains no evidence that Respondent contemporaneously held thousands of dollars in another account after he closed his linked savings and flush accounts.

As to the remaining charges, the Committee found that respondent had violated the record-keeping requirement of DR 9–103(B)(3) and Rule 1.15(a):

Respondent was unable to document his payment of $185 to the Greater Beltsville Hospital. This alone constitutes a violation of DR 9–103(B)(3) and Rule 1.15(a). More importantly, however, the record before the Committee demonstrates Respondent's complete inability to account for the flow of funds that were received on Ms. Langlois' behalf.

The Board concluded that the lack of documentation of the hospital payment alone was sufficient to establish violation of these rules. Noting respondent's testimony about the hospital's failure to assert nonpayment, the Board determined that "[a]n absence of dunning letters does not constitute the maintenance of proper records."

Further, the Committee found that

Respondent did not—because he could not—render a proper accounting to his client [8] of: (i) the actual disbursement of client funds to be made in connection with the personal injury matter; or (ii) his actual disbursement of his client funds held for payment to the client's medical providers.

The Board agreed that "[r]espondent's failure to provide an accounting stems from his failure to render an accounting for the $432 savings resulting from the negotiations with Dr. Launder."

While Respondent contends that he is entitled to any amount saved on Dr. Launder's bill as an offset against out-of-pocket expenses incurred on Ms. Langlois' behalf, Respondent admits that he never provided her with a bill reflecting these disbursements much less advising her that he was taking funds held in trust to pay these alleged costs. While the Board acknowledges that Respondent seems to have incurred significant out-of-pocket expenses, it is not clear from the record or the testimony that Ms. Langlois was aware of the amount of these expenses or of the fact that these expenses were to be taken from the funds held in trust. Ms. Langlois cannot request an accounting of a transaction of which she was unaware.

Relatedly, the Committee found that respondent failed to "promptly deliver to the client" funds she was entitled to receive, Rule 1.15(b), when he kept the $432 that had been set aside to pay Dr. Launder. Both the Committee and the Board rejected respondent's claim that he was entitled to keep this money because of his efforts on Ms. Langlois' behalf in the Naval medical discharge matter. The Committee found "inexplicable" respondent's

failure to notify Ms. Langlois in writing that: (i) he revised the arrangements with her medical providers; (ii) he was billing her for certain additional disbursements in connection with another matter; and (iii) he intended to apply the unexpended trust funds to his benefit.

At bottom, the Committee found, "[r]espondent and his client did not agree on how to

8. "[T]he entire record indicates that [r]espondent's accounting records and procedures were so hopelessly inadequate that he may have been incapable of rendering an accounting."

distribute the funds remaining in trust." Yet instead of leaving the funds in trust and suggesting means to resolve the dispute,[9] "[r]espondent resorted to self-help." The Board, while acknowledging that the record supported respondent's claim of reimbursable expenses and of "gratuitous benefits [he] conferred on Ms. Langlois," agreed that under the January 9 distribution letter respondent may have been able "to demand payment from his client for expenses in excess of $300, but he was not entitled to simply take the $432 with no explanation."

Turning to the issue of sanctions, the Committee recognized the severe consequences under *Addams, supra,* of a finding that respondent's misappropriation of client funds resulted from more than simple negligence. It concluded, nevertheless, that his misappropriation "was at least the result of the reckless handling of client funds." His total conduct which justified this finding, the Committee explained, included the facts that

—Respondent deposited the settlement funds not in a trust account but an account used both for business operations and for personal expenses;

—Respondent had no cogent explanation for the movement of his business accounts to other banks nor did he demonstrate any efforts to trace his client's funds into or out of those accounts;

—Respondent did not *promptly* pay his client's medical providers but did so sporadically over a 30–month period (and in so delaying subjected his client to the harassment of one doctor's bill collectors);

—Respondent never accounted to his client for the savings he negotiated with one of the medical providers;

—Respondent failed to accurately and definitively account for the expenses he claims to have offset with his client's funds; and

—Respondent made no effort to account to his client for said offset. [Emphasis in original.]

Besides recommending disbarment, the Committee concluded that respondent should be ordered to repay Ms. Langlois the $432. The Board majority agreed that respondent's misappropriation entailed more than mere negligence, and that *Addams* therefore requires his disbarment.

### III.

The primary issues before this court are whether respondent committed misappropriation and, if so, whether his conduct was blameworthy enough to require disbarment under *Addams.* Although respondent also disputes the evidentiary sufficiency for the Committee's findings (concurred in by the Board) as to his failure to keep records, account for client funds, and deliver client or third party funds, these violations are ultimately significant because they formed the circumstances surrounding the misappropriation and were found by the Committee and Board to be decisive on the issue of culpability. We therefore treat respondent's claims regarding these violations in connection with the issue of sanction.

### A. Misappropriation

█ As previously explained, this court must accept the Board's (implicitly the Committee's) findings of fact unless they are unsupported by substantial evidence of record. *See In re Cooper,* 591 A.2d 1292, 1294 (D.C. 1991). Whether a determination that there has been misappropriation is a "finding of fact" or instead a legal conclusion (a determination of "ultimate fact")[10] need not detain us, because the underlying facts found by the Board are firmly supported by the record and establish misappropriation clearly and convincingly.

Misappropriation is defined as "any unauthorized use of client's funds entrusted to [the attorney], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not

---

9. See Comment [3] to Rule 1.15 ("The disputed portion of the funds should be kept in trust and the lawyer should suggest means for prompt resolution of the dispute....").

10. *Cf. In re Micheel,* 610 A.2d at 235 (determination that misappropriation was the result of simple negligence "was a determination of 'ultimate fact'—*i.e.,* a conclusion of law").

he derives any personal gain or benefit therefrom."

*Id.* at 1295 (quoting *In re Harrison*, 461 A.2d 1034, 1036 (D.C.1983)) (further citations omitted). "Improper intent is not an essential element of misappropriation." *Id.* Indeed, when client funds are deposited

> into an attorney's operating account . . . misappropriation occurs when the balance in that account falls below the amount due to the client. Misappropriation in such situations is essentially a *per se* offense. . . .

*Micheel*, 610 A.2d at 233 (internal citation omitted); *see also In re Hessler*, 549 A.2d 700 (D.C.1988). In *Hessler*, the court warned against "the totally improper action of placing a client's funds in the attorney's own account," 549 A.2d at 701, an action that creates " 'the danger in all cases that such commingling will result in the loss of the client's money.' " *Id.* at 702 (quoting *Clark v. State Bar*, 39 Cal.2d 161, 168, 246 P.2d 1, 5 (1952)). As long ago as *In re Hines*, 482 A.2d 378 (D.C.1984), therefore, the court "put the Bar on notice that henceforth disbarment would be the usual sanction for misappropriation not involving simple negligence." *Addams*, 579 A.2d at 196.

The Committee found that "by late March 1989, the Citizens/operating account was overdrawn" at a time when "[r]espondent was still holding funds for payment to Ms. Langlois' medical providers." It was this account into which respondent had deposited the settlement check in January 1989, and on which he then drew numerous checks over the next several months to pay personal and business expenses unrelated to payment of his client's medical care providers. On March 13, and again on March 20, the operating account fell to a balance below that required to satisfy the third party claims. At this point, respondent had committed misappropriation.

We reject respondent's argument that because he simultaneously held thousands of dollars in the companion savings account, misappropriation did not occur when the operating account fell below the required balance. That argument is essentially no different than the one rejected in *In re Burton*,

472 A.2d 831 (D.C.), *cert. denied*, 469 U.S. 1071, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984), in which the attorney asserted that by maintaining "sufficient funds [other than in a trust account] to satisfy the requirement of the trust," he complied with the duty to segregate client funds. *Id.* at 838. In adopting the Board's reasoning, we implicitly agreed with its conclusion that "even if respondent did have sufficient cash on hand to cover the shortages, it would not excuse his breach of the trust or his unauthorized use of trust funds." *Id.* We also agreed that the "breach of the trust was [not] cured when he reimbursed the trust account," for "[r]estitution is not a defense to the charge of having misappropriated trust funds." *Id.* In *Harrison, supra,* similarly, we rejected the argument that misappropriation was not shown because, *inter alia,* the dishonoring of the attorney's check to the client "was in violation of an oral agreement with the bank to extend instant credit to cover all checks." 461 A.2d at 1035.

Whether respondent's operating account held funds enough to pay Ms. Langlois' outstanding bills hinged entirely upon whether or not he transferred money to it from his (and his wife's) savings account. His explanation for having failed to make the transfers during March—his frequent absences from the office on business—merely underscores the risk to which he had exposed the client funds by not escrowing them. In short, a trust account is a trust account, not one dependent on discretionary infusions of money from another source. Nor is it significant that, in establishing the "two-tiered" account structure, respondent had followed the advice of bank officials. Respondent's good faith or not—his benign intent—is no more a defense to misappropriation than is "[i]mproper intent . . . an element" of that misconduct. *Harrison*, 461 A.2d at 1036. Moreover, our decisions at least since *Hessler* make such reliance on the advice of third persons (here presumably non-lawyers) in commingling client and personal funds grossly unreasonable.

Even if no misappropriation had occurred in March 1989, both the Committee and the Board found that it took place when respon-

dent opened a Riggs Bank account in April 1989, and drew a check for $345 to Neurodiagnostic Center that was presented twice—in November and December 1989—and dishonored each time. Respondent argues that this could not constitute misappropriation because it was not shown that he had moved the settlement proceeds to this account; for all that appears, he may still have held them in the Citizens checking account, which was not shown to contain insufficient money to cover Langlois' remaining bills during November and December. This argument is sleight-of-hand. The Citizens checking account originally holding the settlement proceeds had twice dropped below the necessary balance by April; respondent then twice attempted to pay a Langlois bill from the newly opened Riggs account, which was itself in overdraft. These circumstances, including respondent's own action implicitly identifying the Riggs account as the successor depository of the settlement funds, relieved Bar Counsel of any duty to trace the movement of client funds from one account to the other. Respondent was free to rebut the inference from his action that the Riggs account had replaced the Citizens accounts that putatively held the client funds in trust, but he failed to do so.[11] *In re Gilchrist,* 488 A.2d 1354, 1357 (D.C.1985); *see also In re Thompson,* 579 A.2d 218, 223 (D.C.1990) (attorney's "inadequate or non-existent explanation for use of a client's funds" is "circumstantial evidence which the Board may consider ... in determining whether Bar Counsel has proven dishonesty"). Thus, even if maintenance of the two Citizens accounts in tandem could satisfy respondent's duty to preserve the inviolacy of client funds, the Board correctly concluded that misappropriation occurred when the Riggs check was twice dishonored, because there was no evidence that respondent held money in another account sufficient to cover his client's remaining obligations. Not until January 15, 1990, five weeks after the December check to Neurodiagnostic Center bounced, did respondent pay the $345 bill.

**B.**

We turn to the issue of proper sanction for the misappropriation. Bar Counsel states initially that the absence of a Board majority for a single recommended sanction makes inapplicable D.C.Bar R. XI, § 9(g), which requires the court to "adopt the recommended disposition ... unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." We shall assume this is so even though the recommendation of three majority members for a disbarment stayed as to all but three months reflects a plea for relaxation of the rule of *Addams, supra,* since otherwise these members "would [also] be constrained to recommend disbarment."[12]

■ At least since *Addams,* "there is a presumption of disbarment in all cases involving misappropriation resulting from more than simple negligence." *Micheel,* 610 A.2d at 233. We agree with the conclusion of the Committee and the Board that respondent's misconduct entailed more than simple negligence. Viewed in its totality, his conduct was reckless. Essentially three considerations led the Committee and the Board, and lead us in turn, to that conclusion.

*First,* respondent's indiscriminate mingling of personal and client funds took place over nearly a year, involved the drawing of a great many personal and unrelated business checks on the operating account into which Langlois' settlement proceeds had been deposited, and resulted in not just a repeated insufficiency of funds in the account to cover the client's obligations, but a repeated overdraft condition of both that account and what was inferentially its successor (the Riggs account), and the repeated dishonoring of checks to one of Langlois' medical care providers. Respondent's reliance on the two-tiered banking structure at Citizens was objectively unreasonable, and his explanations

11. Even in his reply brief he asserts only that the Citizens savings account was closed on August 16, 1989 (its contents transferred to the Citizens checking account), that the Citizens checking account "was still in existence as of August 19, 1989," and that "the record is thereafter silent as to the status" of that account.

12. *See* Separate Opinion of Board member Donnenfeld, at 2.

for its failure as well as for the overdraft condition of the Riggs account (as to the latter, respondent cited "unauthorized third-party withdrawals") were completely unpersuasive. Respondent's commingling of client and personal funds in his business account was negligent to begin with, but his failure to recognize after March of 1989 (when the account fell into overdraft) the danger to which he had exposed the trust funds, instead perpetuating the failure to segregate them in the Riggs account, was reckless.

*Second,* respondent's conduct, as the Committee and Board both found, was marked by a pervasive failure to maintain contemporaneous records accounting for the flow or disposition of client funds either within his "two-tiered" Citizens account or into the Riggs account. This was a partial basis for the Board's finding of an independent violation of DR 9–103(B)(3) and Rule 1.15(a), which we accept. Respondent's claim that he had no due process notice that the discipline authorities would rely on his deficient record-keeping except as to a single obligation—the $185 owed Greater Laurel Beltsville Hospital—is without merit. Bar Counsel's lead charge that respondent misappropriated client money by commingling it with, and using it as, his personal funds informed him adequately that his ability to "trace" or document the use of trust funds not escrowed would be at issue. *See Hessler,* 549 A.2d at 702 & n. 9 (commingling ban designed to permit "tracing [of] the [trust] property"); *Thompson,* 579 A.2d at 223 ("adequacy of attorney's explanation for use of a client's funds" in case charging misappropriation important given "the acute difficulty" of " 'tracing virtually untraceable funds' when the attorney had kept no record of disbursements"). The Committee was justified in considering respondent's "complete inability to account for the flow of funds that were received on Ms. Langlois' behalf" [13] as an aggravating circumstance that raised his conduct beyond the level of mere negligence.

*Third,* the Committee and Board found that, besides the *per se* act of misappropriating funds needed to pay the client's bills,

respondent failed to account for or to deliver to Ms. Langlois the balance of $432 remaining after the bills had been paid, thus independently violating DR 9–103(B)(3) and Rule 1.15(b). Respondent's defense was that this residue, which resulted from his efforts to get Dr. Launder to reduce his charges, in fact belonged to respondent as an offset against out-of-pocket expenses he incurred on Ms. Langlois' behalf in the personal injury and Naval discharge cases as well as in other legal matters. He argued that the retainer agreement informed Langlois that costs were not included in his fee and that the January 9, 1989 distribution letter made clear that "Administrative and Miscellaneous Expenses" were "[a]pproximate" and might exceed the $300 of his fee and $500 in administrative expenses he was waiving. In this court, in addition to arguing that the Board "disregarded his asserted contract right to recover unreimbursed client expenses," respondent asserts that, at a minimum, he retained the $432 "pursuant to a truly held, albeit inaccurate, understanding [of his right that] involved . . . only simple negligence or its equivalent." *In re Cooper,* 591 A.2d 1292, 1297–98 (D.C.1991) (*Cooper I* ) (internal quotation marks omitted); *see also In re Cooper,* 613 A.2d 938 (D.C.1992) (*Cooper II* ).

The Board, contrary to respondent's criticism, dealt painstakingly with his claim of contractual entitlement to the remaining funds. It reasoned as follows:

> Respondent claims entitlement to the amount saved on Dr. Launder's bill as an offset to reimbursable expenses incurred on Ms. Langlois' behalf. The Board notes that the record contains evidence both supporting Respondent's claim of reimbursable expenses and demonstrating gratuitous benefits conferred on Ms. Langlois. Although Ms. Langlois believed that she was under no obligation to pay disbursements, for example, the language of the retainer agreement appears to have obligated Ms. Langlois to do so. The retainer states that Ms. Langlois "agrees to pay, in addition to Attorney's fees, all reasonable and necessary costs as incurred in this matter."

---

13. "How, when and in what amounts Ms. Langlois' funds were moved between these accounts," the Committee concluded, "is impossible to determine."

Furthermore, when Respondent accounted for the distribution of the $20,000 of insurance funds in the distribution letter, he obligated himself to pay $300 more in outstanding expenses than the funds he reserved for that purpose. Respondent also advised Ms. Langlois on a number of other matters at no expense to her. In fact, on one of these matters, Ms. Langlois received a recovery of $2000 with no deductions for Respondent's costs.

Regardless of the benefits to Ms. Langlois, however, the Board feels compelled to adopt the Hearing Committee's finding of a failure to deliver funds to the client. While Respondent may have inadvertently over-obligated himself due to his generous calculations in the distribution letter, Respondent agreed to pay out certain amounts on Ms. Langlois' behalf to certain medical providers, and he was obliged to fulfill those obligations. In light of Respondent's admission that he never provided Ms. Langlois with any sufficient accounting of his expenses or informed her of his intent to retain any savings resulting from the negotiations with Dr. Launder, the Board concurs with the Hearing Committee's conclusion that Respondent resorted to self-help. In the face of a specific agreement, the disbursement letter, limiting his fees, the excess $432 did not belong to Respondent but to his client. He may have been able under his interpretation of the disbursement letter to demand payment from his client for expenses in excess of $300, but he was not entitled to simply take the $432 with no explanation.

We adopt this reasoning. We further reject respondent's argument that his objective good faith—his reasonable but erroneous belief that he was entitled to the balance of funds—reduced his culpability to simple negligence. In *Cooper II*, the court sustained a determination by the Board that an attorney's "truly held, albeit inaccurate, understanding" of his right to apply client funds to earned attorney's fees was the "equivalent" of simple negligence, 613 A.2d at 939, in an exceptional case involving a family representation "characterized by marital discord, revenge, and family feuding." *Cooper I*, 591 A.2d at 1295 n. 4. *See also Cooper II*, 613 A.2d at 939 ("[T]he Board in effect considered that [the attorney's] failure to understand the true state of his authority in this family dealing involved simple negligence or its equivalent....."). The Board reached no such conclusion in the present case; respondent could assert no similar confusion of the dual roles of attorney and family member in extenuation of his fault. Moreover, respondent's failure to deliver the $432 was linked inseparably to his failure to keep records [14] and, most importantly, his failure to escrow the client funds from the beginning.[15] In *Micheel, supra,* this court sustained the Board's conclusion of recklessness in similar circumstances, where "Micheel made no attempt to keep track of his client's funds, but indiscriminately wrote checks on the account at a time when he knew or should have known that the account was overdrawn." 610 A.2d at 236. The aggregation of violations in this case makes it much closer to *Micheel* than to *Cooper.*

\*   \*   \*   \*   \*   \*

For the reasons stated, therefore, the Committee and Board correctly determined that respondent's conduct—including the key acts of misappropriation—was caused by more than simple negligence. It follows that respondent must be disbarred, because the mitigating factors cited to us (his relative inexperience in client representation of this kind,[16] the lack of ultimate disadvantage to

---

**14.** The Committee was "particularly troubled by the absence of both contemporaneous accounting records and a bill concerning the disbursements allegedly made in connection with [r]espondent's representation of Ms. Langlois in the medical discharge matter."

**15.** In that regard the case differs significantly from *In re Choroszej,* 624 A.2d 434 (D.C.1992), in which the attorney deposited and maintained the trust funds in his client trust account and dis-

bursed them properly, but later wrote checks from the account for personal expenses in the "honest, but erroneous, belief" that the only remaining creditor had been paid, so that only funds to which he was entitled as legal fees remained in the account. *Id.* at 435–36.

**16.** Respondent had retired from the Department of Justice in 1986 after some 25 years of government service. Prior to this case, he had had no experience with personal injury representation.

the client,[17] and the comparatively small dollar amounts involved) are not of the extraordinary kind that can overcome "the strong presumption of disbarment" that pertains after *Addams*. *See Micheel*, 610 A.2d at 237 n. 14. *Addams* also, in our view, leaves this division no authority to "stay" the disbarment (as three Board members have recommended) in a case reflecting none of the unusual *Kersey*-type mitigating factors. See note 1, *supra*. Moreover, we agree with the comment of two Board members that a stay of disbarment in favor of suspension plus probation would be "simply a way of paying lip service to the ... rule [of *Addams*]. If the door is opened to allow exceptions to the ... rule that non-negligent misappropriation mandates disbarment, the rule becomes meaningless."[18] The further comment of these Board members is also noteworthy:

> When it adopted [the *Addams*] approach, the Court must have been aware that there would be sympathetic cases like this one where the results would be harsh and even unjust. That is the inevitable result of such rules. The Board does not do the Court a service by trying to mitigate this result. First, we weaken the rule by creating exceptions where the Court has said there should be none. Second, we shield the Court from facing the unpleasant consequences of its decisions. Third, we distort the logic of the law and create precedent that may result in unknown and perhaps unfortunate consequences in other cases. Our job is to follow the Court's decisions.[19]

Individual members of this division also believe the result *Addams* dictates in this case is a harsh one. On the other hand, as the quoted comment acknowledges, in *Addams* the court weighed the concern of seemingly unjust application of a categorical sanction to particular cases against "our concern ... that there not be an erosion of public confidence in the integrity of the bar. Simply put, where client funds are involved, a more stringent rule is appropriate." *Addams*, 579 A.2d at 198. Whether the paramount goal of deterrence that drove the decision in *Addams* can be achieved by lesser, more case-individual sanctions for misappropriation is an issue the full court is always free to revisit—though with the attendant risk of loss of predictability in our exercise of this most critical feature of our regulatory supervision. The division's obligation in this case, in any event, is clear.

It is ORDERED that respondent, Kenneth A. Pels, shall be disbarred from the practice of law in the District of Columbia, effective thirty days from the date of this opinion. It is further ORDERED that respondent shall make restitution to Elizabeth Langlois in the amount of $432. *See* Rule XI, § 3(b); *In re Solomon*, 599 A.2d 799 (D.C.1991).

---

17. Since respondent "waived collection of some funds he had been entitled to receive, ... it can be said that, overall, the client was not significantly disadvantaged nor ... the attorney unjustly enriched by his 'self-help.'" Separate Opinion of Board member Donnenfeld, at 1.

18. Separate Opinion of Board member Fox, at 2–3.

19. *Id.* at 3–4.